# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

Catherine P.,[1]                                )
     Plaintiff,                         )
                                           )
v.                                             )   No. 17 CV 50287
                                           )   Magistrate Judge Iain D. Johnston
Nancy A. Berryhill, Acting                     )
Commissioner of Social Security,               )
     Defendant.                        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Catherine P. brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the Commissioner of Social Security's denial of her claim for social security disability benefits. The administrative law judge flat-out ignored multiple lines of entire evidence that conflicted with the analysis for the denial. For this and other reasons, the Commissioner's decision is reversed and remanded for further proceedings consistent with this Opinion.

## I. BACKGROUND

For over a quarter-century, Plaintiff has suffered from both "severe" and "non-severe" migraine headaches. R. 12, 64-65, 67. Plaintiff's severe migraines, which are menstrual, incapacitate her for two to three days. R. 46, 57-59, 64, 783. Her non-severe migraines, on the other hand, last a day to a day-and-a-half. R. 47-48, 64. According to Plaintiff, medication does not consistently help with her severe migraines; once she experiences a severe migraine, medication merely reduces the pain to a level where Plaintiff does not have to visit the hospital. R. 57-59. Although Plaintiff's non-severe migraines are more manageable, they are still debilitating. R. 47-48, 59. According to Plaintiff, she still cannot function when experiencing a

---

[1] In accordance with Internal Operating Procedure 22, the Court refers to Plaintiff only by her first name and the first initial of her last name.

non-severe migraine, and she ends up lying on the couch, sleeping, while only getting up for short periods of time. *Id.* Plaintiff's migraines are common or non-classical, which means they are not accompanied by aura. R. 69, 788, 883.

Plaintiff asserts that her migraine headaches rendered her disabled on August 8, 1993. R. 111, 130, 260. Her date last insured ("DLI") is December 31, 1997. R. 12. Thus, the relevant period for determining Plaintiff's disability is from August 1993 through December 1997 (the "Relevant Period"). *See McHenry v. Berryhill*, 911 F.3d 866, 869 (7th Cir. 2018). Nonetheless, it is helpful to begin Plaintiff's story some years before her alleged disability onset date.

While attending college in the mid-1980s, Plaintiff began experiencing severe migraines once a month. R. 46-47, 261. Because of these migraines, Plaintiff missed class and an on-campus interview. R. 53. In 1986 or 1987, Plaintiff began working as a public accountant. R. 47, 53, 261. Once Plaintiff began working, her migraines became progressively worse, and she began experiencing severe migraines once or twice a month. R. 47, 53, 64. According to Plaintiff, when she had a migraine, she could not "push through it" to work, and at some point during her employment as an accountant, Plaintiff was missing one to two days a month because of her migraines. R. 53-54. The severity and frequency of Plaintiff's migraines remained the same until 1991, when, in addition to having one to two severe migraines a month, Plaintiff began experiencing *non*-severe migraines twice a week. R. 46-48, 64-65. But Plaintiff's migraines did not cause her to quit her accounting job or be fired from it; instead, when Plaintiff left her job in June 1991, it was to take maternity leave for the upcoming birth of her first daughter. R. 42-43, 53-54, 261, 864.

In May 1992, Plaintiff reported to her gynecologist that her menstrual headaches were "now much improved" with Tylenol. R. 48, 865. Nonetheless, Plaintiff's doctor gave her samples

of another medication to see if they would help with her headaches; if not, Plaintiff would consider going on birth control.  R. 865.

In April 1993, Plaintiff went back to work.  R. 261.  She began a part-time job (working flexible hours, three to four days a week) as the interim financial director for a village government.  R. 44, 55, 261.  Plaintiff testified that she had problems with migraines while working in this position as well.  R. 55-56.  She worked until August 1993, when she took maternity leave to give birth to her second daughter.  R. 42, 45, 261.  After Plaintiff completed her maternity leave, she was offered the opportunity to serve full-time as the village government's financial director.  R. 44-45.  Plaintiff, however, turned down the offer because she could not deal with working while addressing her migraine issues and raising her two young children.  R. 42, 44-46.  Since then, she has not worked or applied for any jobs.  R. 65, 260-61.

Plaintiff testified that after 1992, she saw either her family doctor or her gynecologist twice a year to treat her migraines.  R. 48-49.  Also, Plaintiff continued, she would visit the emergency room whenever her medication was not working and the pain from her migraines was too intense.  R. 51.  After 1992, Plaintiff visited the emergency room "probably twice a year."  R. 50-51.  Plaintiff's husband, though, remembered more treatments and emergency room visits: he testified that during the Relevant Period (August 1993 through December 1997), Plaintiff was treated once or twice a month for her migraines and visited the emergency room more than two times a year.  R. 84-85.

Despite this testimony, the first migraine-related medical record from the Relevant Period does not appear until September 1996—more than three years after Plaintiff's alleged disability onset date.  R. 14, 381-85.  The reason for this gap in treatment records is not clear.  Plaintiff's counsel indicated to the ALJ that most of the records for this time frame had "been destroyed by

the [medical] providers;" R. 96, whereas, the ALJ apparently believed the lack of records reflected a lack of treatment. *See* R. 14. In any case, Plaintiff presented to the emergency room on September 4, 1996, complaining of an "atypical migraine headache times three days" and "significant nausea and vomiting." R. 382. She reported that her last migraine headache had been approximately two months ago. *Id.* Although Plaintiff was taking Imitrex[2] (which would have been prescribed by one of her doctors) and Tylenol #3, she had been unable to keep the Imitrex down and her migraine was "unrelieved" by the Tylenol. R. 50, 382-83. Plaintiff was administered Imitrex subcutaneously—which only slightly improved her headache and nausea—and then was given Demerol[3] and Phenergan,[4] which worked significantly better. R. 381, 383. Plaintiff was discharged from the emergency room in good condition. R. 381.

On September 30, 1996, Plaintiff referred herself to neurologist Dr. Scott Metrick regarding her "recurrent 'migraine' headaches." R. 781. Dr. Metrick prescribed Depakote,[5] which would be increased to 500 mg twice a day, and a trial of Midrin[6] on an as needed basis. *Id.* A few months later, in December 1996, Dr. Metrick reported that Plaintiff was "[d]oing well on

---

[2] Imitrex is used to treat, but not prevent, acute migraine headaches in adults. Mayo Clinic, Sumatriptan (Oral Route) Description and Brand Names, https://www.mayoclinic.org/drugs-supplements/sumatriptan-oral-route/description/drg-20074356 (last visited Mar. 4, 2019). It is only available with a doctor's prescription. *Id.*

[3] Demerol is a narcotic used to help relieve moderate to severe pain. Mayo Clinic, Meperidine (Injection Route) Description and Brand Names, https://www.mayoclinic.org/drugs-supplements/meperidine-injection-route/description/drg-20074161 (last visited Mar. 4, 2019).

[4] Phenergan can be used to treat, among other things, nausea and vomiting. Mayo Clinic, Promethazine (Injection Route, Intravenous Route) Description and Brand Names, https://www.mayoclinic.org/drugs-supplements/promethazine-injection-route-intravenous-route/description/drg-20070638 (last visited Mar. 4, 2019).

[5] Depakote helps prevent migraine headaches. Mayo Clinic, Valproic Acid (Oral Route) Description and Brand Names, https://www.mayoclinic.org/drugs-supplements/valproic-acid-oral-route/description/drg-20072931 (last visited Mar. 4, 2019).

[6] Midrin is used to relieve tension and migraine headaches. WebMD, Midrin Oral: Uses, https://www.webmd.com/drugs/2/drug-6603/midrin-oral/details (last visited Mar. 4, 2019).

Depakote," and that she had one bad headache, which responded to an oral dose of Imitrex. R. 782. Dr. Metrick continued Plaintiff on 500 mg Depakote, twice daily, and 50 mg of Imitrex as needed. *Id.* Plaintiff testified at her hearing that Depakote helped for "maybe six months." R. 50.

On April 8, 1997, Plaintiff returned to the emergency room complaining of migraine headaches. R. 378-80. She was given Imitrex subcutaneously and improved only slightly. R. 379-80. After Plaintiff refused other medication because she needed to stay awake to care for her children, she was given Vicodin to take at home and was discharged. R. 378-80. A few weeks later, Plaintiff visited Dr. Metrick again. R. 783. Dr. Metrick noted that Plaintiff's migraines were menstrual and that she was having severe (9-10 out of 10) headaches monthly. *Id.* Referring to Plaintiff's recent emergency room visit, Dr. Metrick also noted: "Had a bad HA in ER 4/8/97 $\rightarrow$ Imitrex injection no help. Went off Depakote." *Id.* Dr. Metrick continued Plaintiff on Imitrex, took her off Depakote, and started her on Midrin as needed. *Id.*

In November 1997, Plaintiff began visiting the Diamond Headache Clinic. R. 788, 791. She was diagnosed with a non-classical migraine and muscle contraction headache, prescribed new medications (including Imitrex nasal spray), and instructed to keep a headache calendar. R. 788. On December 8, 1997, Plaintiff reported to the Diamond Headache Clinic that she was "[b]etter" and that, in the past three weeks, she had experienced three to four mild to moderate headaches. R. 791. The notes also suggest that Imitrex tablets were "helpful" and "more effective" than the prescribed Imitrex nasal spray. R. 788, 791.

Plaintiff presented to the Diamond Headache Clinic again in February 1998, reporting that she had suffered three severe headaches since her last visit (in December 1997) and had suffered three to four mild headaches per month. R. 792. She was kept on the Imitrex nasal spray but also prescribed several new medications, including Imitrex tablets. R. 789. Nonetheless, Plaintiff was

back in the emergency room in April 1998 for a severe migraine. R. 373-77, 797. She had used a single dose of Imitrex nasal spray, which improved but did not resolve her headache. R. 374. She was administered Imitrex subcutaneously, which similarly improved but did not resolve the pain. R. 373. After Plaintiff was given Demerol and Phenergan, though, she experienced substantial improvement, and she was discharged. *Id.* At her last visit with Diamond Headache Clinic in May 1998, Plaintiff reported suffering one severe headache per month and four to five mild headaches per month. R. 792. She also reported that both the Imitrex nasal spray and tablets were not helpful. *Id.* Both medications were then discontinued. R. 790.

During this time, Plaintiff also kept a headache calendar, which recorded, among other things, when she experienced migraines and their severity. R. 796-98.[7] From December 15, 1997 through the end of the year (which coincided with Plaintiff's DLI), Plaintiff experienced one severe migraine and three less severe migraines. R. 796. In January 1998, Plaintiff suffered one severe migraine and four to five less severe migraines; in February, two to three severe migraines; in March, one severe migraine and four to five less severe migraines; in April, one severe migraine that sent her to the emergency room (as noted above) and six less severe migraines; and through the first two weeks of May, one severe migraine and four less severe migraines. R. 796-98.

In January 1999, Plaintiff presented to neurologist Dr. Benjamin Nager complaining of headaches. R. 882-83. Plaintiff reported that she had been having a severe, menstrual migraine headache every month for the last four or five years. R. 882. She also reported that she has "many less severe headaches during the month." *Id.* According to Plaintiff, although Imitrex injections were helpful, Depakote did not provide relief. R. 882-83.

---

[7] Although the headache calendar itself does not expressly identify the year(s) it covers, Plaintiff was instructed to begin one in November 1997. R. 788. Thus, it is reasonable to assume that the entries in the calendar start the next month, in December 1997. In any event, the Government does not dispute that the headache calendar addresses December 1997 through May 1998.

## II. PROCEDURAL HISTORY

On January 11, 2014, Plaintiff filed for Disability Insurance Benefits ("DIB"). R. 111. After her application was denied initially and upon reconsideration, Plaintiff requested a hearing. R. 111, 122, 126-30, 132-38. On February 25, 2016, an administrative law judge ("ALJ") convened a hearing; however, the ALJ ultimately decided to postpone the hearing because the evidentiary record was incomplete and Plaintiff had just recently submitted medical records. R. 91-103. The ALJ reconvened the hearing on September 8, 2016. R. 36-90. Plaintiff, represented by counsel, testified, as did her husband. R. 36-38, 41-67, 80-85. A medical expert ("ME") and a vocational expert ("VE") also testified. R. 67-79, 86-90.

In an October 11, 2016 written decision, the ALJ denied Plaintiff's request for disability benefits. R. 7-25. In doing so, the ALJ applied the five-step sequential evaluation process required by 20 C.F.R. § 404.1520. R. 11-12. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from her alleged disability onset date through her DLI, i.e., during the Relevant Period. R. 12. At step two, the ALJ found that Plaintiff's migraine headaches constituted a severe impairment during the Relevant Period. *Id.* At step three, the ALJ determined that, during the Relevant Period, Plaintiff did not have any impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 12-13. The ALJ then concluded that Plaintiff had a residual functional capacity ("RFC") during the Relevant Period to perform light work as defined in 20 C.F.R. § 404.1567(b) except for the following: she had to avoid ladders, ropes, scaffolds, and concentrated exposure to hazards, including unprotected heights and dangerous, moving machines, and she could not engage in commercial driving. R. 13. At step four, the ALJ found that Plaintiff had no past relevant work. R. 15. At step five, though, the ALJ concluded that during the Relevant Period, Plaintiff could

have performed jobs that existed in significant numbers in the national economy, such as garment sorter, cashier, and office helper. R. 15-16. Thus, the ALJ found that Plaintiff was not disabled during the Relevant Period. R. 16.

After the Appeals Council denied review of the ALJ's decision, it became the final decision of the Commissioner and, thus, reviewable by this Court. R. 1-5; *see* 42 U.S.C. § 405(g); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

### III. LEGAL STANDARD

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Accordingly, the Court cannot overturn the Commissioner's decision "by reconsidering facts or evidence, or by making independent credibility determinations." *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

At the same time, the Court's review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). If the Commissioner's decision "lacks evidentiary support or an adequate discussion of the issues," then the Court must remand the matter. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Moreover, a reviewing court must "conduct a critical review of the evidence before affirming the Commissioner's decision." *Id.* (internal quotations omitted). "Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion." *Edmonson v. Colvin*, No. 14 CV 50135, 2016 WL 946973,

at *2 (N.D. Ill. Mar. 14, 2016). The reviewing court cannot build the requisite logical bridge between the evidence and the ALJ's conclusions on behalf of the ALJ or the Commissioner. *Id.*

## IV. DISCUSSION

Plaintiff argues that remand is required because: (1) the ALJ erred in assessing her subjective symptom allegations; (2) the ALJ erred in assessing testimony and statements offered by Plaintiff's husband and her mother-in-law; and (3) the ALJ improperly evaluated the opinion evidence offered by the ME at the hearing. The Court agrees that remand is required because the ALJ reversibly erred in assessing Plaintiff's subjective symptom allegations.

An ALJ's assessment of a claimant's subjective symptom allegations is afforded "special deference" and will be overturned only if it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted). This deference notwithstanding, the ALJ is still required to "build an accurate and logical bridge between the evidence" and her subjective symptom assessment. *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000) (internal quotations omitted). The Court also has "greater leeway to evaluate the ALJ's determination" when it "rests on objective factors or fundamental implausibilities, rather than on a claimant's demeanor or other subjective factors." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (internal quotations omitted). "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

Here, as in nearly every decision this Court reviews, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects" of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." R. 13; *see Patricia B. v. Berryhill*, No. 17 CV 50201, 2019 WL 354888, at *5 (N.D. Ill. Jan. 29, 2019). Importantly

for purposes of this Court's review, though, the ALJ then proceeded to give reasons for this adverse finding. *See Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) (explaining that the use of boilerplate language is not problematic when it "is followed by an explanation for rejecting the claimant's testimony"). The problem is that the reasons provided by the ALJ "are legally insufficient and not supported by substantial evidence," which requires remand.[8] *Toliver v. Berryhill*, No. 17 C 4000, 2018 WL 6398912, at *5 (N.D. Ill. Dec. 6, 2018).

The ALJ began by discounting Plaintiff's testimony that she experienced severe headaches once or twice a month and non-severe headaches twice a week during the Relevant Period because, according to the ALJ, the only evidence showing recurrent headaches prior to the DLI was a December 8, 1997 medical record noting three to four mild (non-severe) headaches in three weeks. R. 13 (citing R. 791). But the ALJ overlooked other pre-DLI evidence documenting Plaintiff's recurrent migraines. An April 1997 office note reports that Plaintiff's severe headaches occur "monthly." R. 783. And the December 1997 portion of Plaintiff's headache calendar shows that she experienced one severe migraine and three non-severe migraines over a two-week span prior to her DLI. R. 796. Additionally, Plaintiff's severe migraines are menstrual, *see* R. 57, 783, 882, which further supports Plaintiff's once or twice per month estimate.[9] By misreading the evidentiary record, the ALJ failed to build a logical and accurate bridge between the evidence and

---

[8]   The Court, however, does not address the ALJ's finding that despite her migraines, Plaintiff "still remained fairly active" because she graduated from college without difficulty, worked a full-time job without being fired for an inability to sustain work, and raised two young children with minimal assistance. R. 14. The Government did not defend this finding; instead, it asserted that this information was "of limited probity" and claimed that any error in this finding was harmless. Dkt. #16 at 8. Thus, the Government has forfeited the ALJ's reliance on this finding to support the subjective symptom evaluation. *See Kelly v. Colvin*, No. 14 C 1086, 2015 WL 4730119, at *5 (N.D. Ill. Aug. 10, 2015).

[9]   The average menstrual cycle is 28 days long, although cycles can range from 21 to 35 days in adults. MedicineNet, Menstrual Period Definition, Symptoms, and Pain Relief, https://www.medicinenet.com/menstruation/article.htm (last visited Mar. 4, 2019).

her decision to discount Plaintiff's testimony about the frequency of her migraines. *Fisher v. Berryhill*, --- F. App'x ----, 2019 WL 644219, at *5 (7th Cir. Feb. 15, 2019) (finding that a conclusion based on a mischaracterization of the record lacked "a logical link between the evidence and [the] conclusion"); *see also Kaminski v. Berryhill*, 894 F.3d 870, 874 (7th Cir. 2018) (explaining that a decision premised on an "incorrect interpretation of the medical evidence" is "not supported by substantial evidence").

The ALJ also improperly ignored relevant post-DLI evidence. Although a claimant must prove that she became disabled before her DLI, *McHenry*, 911 F.3d at 869, evidence from *after* the DLI may still be relevant and should be considered by an ALJ. *See Gade v. Berryhill*, No. 17 cv 2209, 2018 WL 1174393, at *3 (N.D. Ill. Mar. 6, 2018). Post-DLI evidence may shed light on a claimant's condition before the DLI, and it may also help corroborate a claimant's subjective complaints. *See, e.g.*, *Halvorsen v. Heckler*, 743 F.2d 1221, 1225-26 (7th Cir. 1984); *Hansen v. Berryhill*, No. 17 C 3131, 2018 WL 3458281, at *3-4 (N.D. Ill. July 18, 2018).

The most salient piece of post-DLI evidence disregarded by the ALJ is the portion of Plaintiff's headache calendar that recorded the recurrence of her migraines from January 1998 through May 1998. R. 796-98. There is no reason to believe that the frequency and severity of Plaintiff's migraines suddenly changed once her insured status expired or within the immediately following months. And in January 1999, Plaintiff reported that for the last four or five years (that is, since 1994 or 1995, which is squarely within the Relevant Period) she had been having a severe, menstrual migraine every month, and that she has "many less severe headaches during the month." R. 882. These reports, which were also ignored by the ALJ in evaluating Plaintiff's subjective symptoms, likewise lend credence to Plaintiff's allegations years later about the severity and frequency of her migraines during the Relevant Period.

This evidence is bolstered by the hearing testimony of Plaintiff's husband. *See Brinley v. Berryhill*, 732 F. App'x 461, 466 (7th Cir. 2018) (explaining that "the fact that the husband's report echoes many of the points [the claimant] made in her own report . . . is a reason to find that her account was corroborated by a family member"). He testified that Plaintiff suffered severe headaches three to four times a month during the Relevant Period (a higher frequency than Plaintiff alleged, to be sure, but still supportive of Plaintiff's allegations of recurrent severe headaches). R. 80-82. Plaintiff's husband also claimed that he would have to leave work early to come home two to three times per month because of Plaintiff's migraines. R. 83. Yet the ALJ did not address this testimony in her decision either. *See* R. 13-15 (only addressing a statement submitted by Plaintiff's husband before the hearing).

Proceeding with her subjective symptom evaluation, the ALJ then found that Plaintiff repeatedly admitted "that her headaches responded to medication." R. 14. An ALJ may properly consider the effectiveness of a claimant's medication in evaluating her subjective symptom allegations. *See* SSR 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016). Here, though, the ALJ improperly neglected to address records suggesting that Plaintiff's headaches did *not* respond as effectively to medication as the ALJ seemed to believe. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("[T]he ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it."); *Aguirre-Millhouse v. Colvin*, No. 13 C 5123, 2015 WL 3757423, at *6 (N.D. Ill. June 15, 2015) ("[A]n ALJ may not adversely assess a claimant's credibility based on 'the ALJ's own spin on the medical record' or by taking a 'sound-bite' approach in evaluating the record.") (quoting *Czarnecki v. Colvin*, 595 F. App'x 635, 644 (7th Cir. 2015)).

For instance, the ALJ cited a May 1992 medical note reporting that Plaintiff's menstrual headaches were "now much improved" with Tylenol. R. 14 (citing R. 865). But even if this note reflected Tylenol's efficacy when Plaintiff's disability began (over a year later), the ALJ did not address the latter half of the note.[10] In that portion of the note, Plaintiff's doctor reported that she gave Plaintiff samples of another medication to help with her headaches and that, if that medication did not help, Plaintiff would consider going on birth control. R. 865. If Plaintiff's menstrual migraines had sufficiently responded to and improved with Tylenol, it would be very odd for her doctor to prescribe Plaintiff another medication or recommend birth control to help with her migraines. There may be a legitimate explanation for discounting these additional portions of the medical note, but the ALJ failed to give one. *See Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected."); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability.").

Other evidence overlooked by the ALJ further undermines her belief that Plaintiff's headaches consistently responded to medication. According to Plaintiff's husband, whose testimony the ALJ did not address in her decision, medications did not help Plaintiff's migraines. R. 85. The September 1996 emergency room report also states that Plaintiff's migraine was "unrelieved" by Tylenol #3 and that Imitrex tablets had likewise been ineffective, as Plaintiff could not keep them down. R. 382-83. And although Plaintiff reported being "better" and suggested

---

[10] The Court also notes that without first knowing the status of Plaintiff's headaches when she did not take Tylenol, knowing that these headaches are "much improved" with Tylenol does not shed any light on Plaintiff's condition. *See Salazar v. Colvin*, No. 13 C 9230, 2015 WL 6165142, at *4 (N.D. Ill. Oct. 20, 2015) (finding an ALJ's reliance on a 60% improvement "meaningless because she failed to establish a baseline from which the stated improvement can be measured").

that her medications were "helpful" on December 8, 1997, her headache calendar shows that in the three weeks following that visit, she still experienced one severe headache and three non-severe headaches. R. 791, 796. In fact, despite the ALJ's rosy view of the December 8, 1997 visit, Plaintiff reported less than three months later that she had suffered three severe headaches in that time span, as well as three to four mild headaches per month, which suggests that the medication prescribed at the time of the December 1997 visit may not have been consistently effective. R. 792. The ALJ did not explain why she rejected this evidence. *See Moore*, 743 F.3d at 1123.

The ALJ's reliance on a May 1998 note to support her reasoning was likewise flawed. R. 14 (citing R. 792). First, the ALJ believed the note, which reports that Plaintiff complained of one severe headache per month, showed "fewer severe headaches" as of May 20, 1998. R. 14, 792. This was wrong: Plaintiff had been reporting the same frequency of severe headaches (one per month) for several months beforehand. In April 1997, Plaintiff complained of monthly severe headaches, and in each of the months from December 1997 through May 1998 (except for February), Plaintiff reported one severe headache. R. 783, 792, 796-98. Thus, the ALJ's belief that Plaintiff was suffering fewer severe headaches by May 1998 was not supported by substantial evidence. *See Kaminski*, 894 F.3d at 874; *Fisher*, 2019 WL 644219, at *5. Second, the ALJ ignored the portions of the May 1998 treatment records indicating that both Plaintiff's Imitrex nasal spray and tablets were discontinued because they were no longer helpful. R. 790, 792. Again, the ALJ did not confront and explain why she rejected this evidence, which undercuts her apparent belief that Plaintiff's medication consistently helped her headaches. See *Moore*, 743 F.3d at 1123; *Campbell*, 627 F.3d at 306.

Relatedly, the ALJ reasoned that Plaintiff's improvement with medication was confirmed by the fact that in April 1997, Plaintiff "acknowledged suffering a severe headache after failing to

take her medications as prescribed." R. 14 (citing R. 783). The medication at issue seems to be Depakote, which Plaintiff was taking and "[d]oing well" on as of December 1996. R. 782. In April 1997, however, Dr. Metrick noted that Plaintiff "[h]ad a bad HA in ER 4/8/97 → Imitrex injection no help. *Went off Depakote*." R. 783 (emphasis added). The ALJ apparently interpreted this as showing that because Plaintiff stopped taking ("went off") Depakote, she suffered the severe migraine that sent her to the emergency room on April 8, 1997.

But simply because Plaintiff went off Depakote (at some unknown time between December 1996 and her April 1997 emergency room visit) and then suffered a severe headache does not mean that the former caused the latter. *See Sample v. Rend Lake Coll.*, No. 04-CV-4161-JPG, 2005 WL 2465905, at *11 (S.D. Ill. Oct. 5, 2005) ("[I]t is axiomatic that temporal succession does not imply a causal relation.").[11] And if Depakote was sufficiently and successfully preventing Plaintiff's severe headaches, as the ALJ apparently thought, Dr. Metrick would not have taken Plaintiff off Depakote after the April 1997 emergency room visit. R. 783. Without more in the record, such as an explanation by Dr. Metrick or another doctor that Plaintiff's discontinuation of Depakote caused the severe headache that sent her to the emergency room, the ALJ's interpretation impermissibly amounted to "playing doctor." *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

---

[11] After an extra-inning, nail biting Game Seven victory, the Chicago Cubs won the World Series on November 2, 2016. Just a mere six days later, on November 8, 2016, Donald J. Trump was elected the forty fifth president of the United States of America. Coincidence? Yes! Indeed, *Sports Illustrated* proved this point when it wrongly suggested that the Cubs' victory predicted a Hillary Clinton presidency. www.si.com/extra-mustard/2016/11/02/world-series-game-7-chicago-cubs-cleveland-indians-election.

The ALJ also pointed to the limited amount of treatment Plaintiff received during the Relevant Period as indicative of her medication's effectiveness. R. 14. An ALJ may consider a claimant's failure to frequently seek treatment to find that "the alleged intensity and persistence of [the claimant's] symptoms are inconsistent with the overall evidence of record." SSR 16-3p, at *8. Here, the ALJ found that, despite an alleged disability onset date of August 8, 1993, Plaintiff did not first seek treatment for her migraines until an emergency room visit in September 1996. R. 14, 381-85. And Plaintiff only visited the emergency room one other time during the Relevant Period (in April 1997), where she did not need "fluids or intravenous medication." R. 14, 378-80. This, in the ALJ's view, demonstrated that Plaintiff's migraines "were controlled with her general treatment and home medications." R. 14. Finally, the ALJ found relevant that Plaintiff's doctors never referred her to a neurologist (Plaintiff referred herself to Dr. Metrick), whom she then only consulted in September 1996 and April 1997. R. 14, 781-83.

Again, the ALJ's analysis improperly ignored contrary evidence. Testimony from both Plaintiff and her husband indicates that she sought treatment for her migraines before her September 1996 emergency room visit and that she visited the emergency room more than two times during the Relevant Period. Plaintiff testified that after 1992, she saw either her family doctor or her gynecologist twice a year to treat her migraines, and that she visited the emergency room for her headaches "probably twice a year" as well. R. 48-51. And her husband testified that during the Relevant Period, Plaintiff was treated once or twice per month for her migraines and visited the emergency room more than two times per year. R. 84-85. Also, when Plaintiff visited the emergency room in September 1996, she had "recently been started on Imitrex." R. 382. Because Imitrex requires a doctor's prescription (indeed, Plaintiff testified that Imitrex would have been prescribed to her by one of her doctors, *see* R. 50), this notation further indicates that

Plaintiff's September 1996 visit was not the first time she sought migraine treatment during the Relevant Period. But the ALJ did not confront any of this evidence, as she was required to do. *Moore*, 743 F.3d at 1123.

Admittedly, there does not appear to be any expressly documented treatment between August 1993 and September 1996. But Plaintiff's attorney asserted that the medical providers had destroyed many of the records for this time frame. R. 96. If true, this could explain the lack of documented treatment during this time frame, especially given the other evidence suggesting that Plaintiff received treatment before September 1996. Although the ALJ was not necessarily required to believe that the lack of treatment records between August 1993 and September 1996 was due to their destruction, she should have articulated why she did not believe this explanation. *Cf. Jones v. Colvin*, No. 15 C 11310, 2016 WL 4798956, at *5 (N.D. Ill. Sept. 14, 2016) (finding that where an ALJ does not believe a claimant's proffered explanations for her lack of treatment or finds those explanations insufficient, she is required to explain why).

As for Plaintiff's apparent ability to do without "fluids or intravenous medication" at an emergency room visit, the ALJ does not point to any evidence suggesting that this somehow reflects the efficacy of Plaintiff's "general treatment and home medications." R. 14. And without any such evidence, this strikes the Court as another instance of the ALJ improperly "playing doctor." *See Moon*, 763 F.3d at 722 ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves."). Nor does the ALJ explain why Plaintiff's allegations are undermined by the failure of her physicians to refer her to a neurologist. R. 14; *see Shramek*, 226 F.3d at 811 (explaining that an ALJ must "build an accurate and logical bridge between the evidence" and her conclusions regarding a subjective symptom assessment) (internal quotations omitted).

The ALJ also erred in finding that Plaintiff only saw her neurologist, Dr. Metrick, twice during the Relevant Period. R. 14. In fact, she saw him three times: in September 1996, December 1996, and April 1997. R. 781-83. And Plaintiff did not stop seeking treatment altogether when she last saw Dr. Metrick in April 1997, as the ALJ's recitation of the evidence implies. *See* R. 14. To the contrary, Plaintiff sought treatment from the Diamond Headache Clinic four times between November 1997 and May 1998. R. 788-92. By not acknowledging Plaintiff's December 1996 visit with Dr. Metrick and her November 1997 through May 1998 visits to the Diamond Headache Clinic, the ALJ improperly failed to "address the evidence in a balanced manner." *See Moore*, 743 F.3d at 1126.

Lastly, the ALJ noted the lack of documented abnormalities, neurological or other deficits, associated aura, and, "[m]ore importantly," the failure of certain medical records to mention "an inability to function or effect on functioning." R. 14. The absence of documented abnormalities or neurological deficits, however, does not detract from Plaintiff's allegations about her migraines. Migraines do not stem from abnormalities "that can be detected by imaging techniques, laboratory tests, or physical examination." *Longerman v. Astrue*, No. 11 CV 383, 2011 WL 5190319, at *8 (N.D. Ill. Oct. 28, 2011) (internal quotations omitted); *see also Tyson v. Astrue*, No. 08-CV-383-BBC, 2009 WL 772880, at *9 (W.D. Wis. Mar. 20, 2009) (finding that the ALJ "impermissibly 'played doctor'" by citing "the absence of abnormal neurological or other physical findings as a factor detracting from plaintiff's claim that she suffers from disabling headaches"). In fact, the ME testified that menstrual migraines (like Plaintiff's severe migraines) do "not have any, any effect on the neurological system" and usually would not "have any neurological abnormalities." R. 77. And because Plaintiff's migraines are common or non-classical—which, as the ME

testified, are not accompanied by aura—the lack of documented aura is not surprising, and it does not undermine Plaintiff's allegations. R. 14, 69, 788.

Furthermore, the ALJ does not explain why it is important that the records of Plaintiff's April 1997 emergency room visit and her visits to Dr. Metrick in 1996 and 1997 do not mention "an inability to function or effect on functioning." R. 14 (citing R. 380-81, 781-83). Indeed, it is unclear what "functioning" the ALJ believed should have been addressed by these medical records. If the ALJ expected Plaintiff's emergency room doctors or Dr. Metrick to address Plaintiff's ability to function in a work environment, such an expectation was unreasonable, as Plaintiff was not working in 1996 and 1997. R. 65, 260-61; *see Eskew v. Astrue*, 462 F. App'x 613, 616 (7th Cir. 2011) ("The absence of major work restrictions in Eskew's medical records does not illuminate the question of her credibility—she was after all unemployed throughout the time in question."). And even if these medical records do not affirmatively corroborate Plaintiff's allegations about the severity of her migraines, this alone is not a sufficient reason to disregard these allegations. *See Ghiselli v. Colvin*, 837 F.3d 771, 777 (7th Cir. 2016) ("[T]he absence of objective medical corroboration for a complainant's subjective accounts of pain does not permit an ALJ to disregard those accounts.").

In sum, the ALJ's assessment of Plaintiff's subjective symptom allegations was "patently wrong," and remand is required. *See Toliver*, 2018 WL 6398912, at *7. On remand, the ALJ should resolve the issues identified above and properly evaluate Plaintiff's subjective symptom allegations in accordance with SSR 16-3p. The ALJ should also address and evaluate the hearing testimony of Plaintiff's husband in accordance with SSR 06-03p.[12] Ultimately, the ALJ should ensure that she explains her subjective symptom assessment "with enough detail and clarity to

---

[12] SSR 06-03p addresses how ALJs are to consider evidence from non-medical sources, such as spouses and relatives. SSR 06-03p, 2006 WL 2329939, at *2, *6 (Aug. 9, 2006).

permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Given the ALJ's "patently wrong" subjective symptom assessment, the Court need not conclusively resolve Plaintiff's remaining challenges on appeal. Even so, the Court believes that the ALJ should take another look at the third-party statements submitted by Plaintiff's husband and mother-in-law shortly before the September 2016 hearing. R. 347-50. The ALJ should evaluate these statements in accordance with SSR 06-03p. If the ALJ again finds these statements inconsistent with the evidence in the case, *see* R. 14-15, she should articulate the purported inconsistencies "with enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351.

The Court further notes that although the ALJ found that the ME's opinion was "not well supported by the record as a whole," R. 15, she then constructed Plaintiff's RFC by adopting all the functional limitations offered by the ME at the hearing. *Compare* R. 13, *with* R. 73-74. This is bizarre and nonsensical. The Court doubts that the ALJ's RFC determination, which is based solely upon a medical opinion that the ALJ expressly found to be not well supported by the evidentiary record, is itself supported by substantial evidence. *See, e.g.*, *Barr v. Colvin*, No. 14 C 0725, 2015 WL 6530666, at *3 (N.D. Ill. Oct. 28, 2015) (finding that the ALJ failed to build the requisite accurate and logical bridge when her RFC determination was based on a medical opinion that she had given "little weight"); *Williams v. Berryhill*, No. 1:17cv345, 2018 WL 3062403, at *8 (N.D. Ind. June 21, 2018) (finding that because the ALJ relied upon medical opinions that "were not supported by the evidence as a whole," the ALJ's opinion was likewise not supported by substantial evidence); *Bowers v. Berryhill*, No. 1:17-cv-00633-SEB-MJD, 2017 WL 6989114, at *5 (S.D. Ind. Dec. 29, 2017) (finding that the ALJ's RFC assessment was not supported by

substantial evidence because the medical opinions it relied upon were not supported by relevant evidence).

Nonetheless, after reassessing Plaintiff's subjective symptom allegations on remand, the ALJ also will need to reassess Plaintiff's RFC. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (explaining that "the assessment of a claimant's ability to work will often . . . depend heavily on the credibility of [the claimant's] statements concerning the 'intensity, persistence and limiting effects' of her symptoms"); *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (explaining that an RFC is based on both medical evidence and "other evidence, such as testimony by the claimant or his friends and family"). In doing so, the ALJ should ensure that she builds the requisite accurate and logical bridge from the evidence to her RFC determination. *See Young v. Barnhart*, 362 F.3d 996, 1002 (7th Cir. 2004); *Barr*, 2015 WL 6530666, at *3; *see also Fisher*, 2019 WL 644219, at *5 (explaining that an ALJ's ruling is not supported by substantial evidence if the ALJ has failed "to build a logical and accurate bridge between the evidence and conclusion").

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion is granted; the Government's motion is denied; and the decision of the ALJ is reversed and remanded for further review.


Entered: March 6, 2019                    By: _____
                                              Iain D. Johnston
                                              United States Magistrate Judge